```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION


  United States of America          )
                                    )
                                    )
       v.                           ) No. 19-cr-571
                                    )
                                    )
  Angelo Perdomo-Gomez              )
                                    )
              Defendant.            )
                                    )
```

<u>Memorandum Opinion and Order</u>

Angelo Perdomo-Gomez was indicted for possession with intent to distribute more than 100 grams of heroin in violation of 21 U.S.C. § 841(a)(1). ECF No. 11. Mr. Perdomo-Gomez has now moved to suppress drug evidence seized by law enforcement officials on March 2, 2017, along with any fruits later derived from that evidence. ECF No. 55. The court held an evidentiary hearing on this issue on September 15, 2021. ECF No. 63. Having considered the evidence adduced at that hearing, as well as the parties' arguments, I now deny the motion to suppress.

I.

In November 2016, Homeland Security Investigations ("HSI") received information from an Alabama field office that a confidential informant had reported a narcotics money pickup set to occur in Chicago on November 24, 2016. ECF No. 64 at 15:19-

16:23. Special Agent Michael Moore, the assigned case agent, conducted surveillance at the reported time and place, and he testified that he observed Mr. Perdomo-Gomez pick up the confidential informant in a silver Chevy Traverse, enter a hotel carrying a red roller bag accompanied by the confidential informant, and then leave the hotel approximately 30 minutes later empty handed. *Id.* at 14:15-20, 17:3-18:9. Mr. Perdomo-Gomez then drove to and left the Chevy Traverse in a garage off Wabansia and Keeler in Chicago. *Id.* at 19:14-19. After Mr. Perdomo-Gomez left, Special Agent Moore entered the hotel, searched the roller bag, and found approximately $380,000 in cash. *Id.* at 18:10-23. The confidential informant reported that Mr. Perdomo-Gomez explained (in Spanish) that he was "short" because the money he delivered was the maximum amount that would fit in the Chevy Traverse's secret "trap" compartment. *Id.* at 18:24-19:10, 41:20-25.

On December 20, 2016, while conducting surveillance, Special Agent Moore observed Mr. Perdomo-Gomez retrieve the same Chevy Traverse from the garage near Wabansia and Keeler, leaving his own car, an Infiniti sedan, nearby. *Id.* at 19:20-20:13. Mr. Perdomo-Gomez drove the Traverse to the area around Richmond and 71st, where two men, later identified as Francisco and Miguel Moya, joined him inside the Traverse. *Id.* at 20:14-23. After a few minutes, the Moyas left the car carrying a black gym bag and entered a residence on Richmond. *Id.* at 21:2-14. Mr. Perdomo-

Gomez drove away. Francisco Moya then exited the residence, and bundles of cash could be observed protruding from the pockets in his jacket. *Id.* at 22:2-11. The officers surveilling the scene asked for and received consent to search the house, where they found the black gym bag, which was filled with approximately $150,000 in cash. *Id.* at 22:12-23:3. They also found a ledger and interviewed Lillie Moya, who said the Moyas had been moving narcotics proceeds for approximately the last year. *Id.* at 23:4-24:3.

After Mr. Perdomo-Gomez left the Moya residence, the Chicago Police Department initiated a traffic stop of Mr. Perdomo-Gomez. *Id.* at 24:4-17. Following the stop, HSI surveillance agents spoke with the Chicago police, who identified the driver of the Traverse as Mr. Perdomo-Gomez. *Id.* at 24:18-25:1. This was the first time Special Agent Moore learned Mr. Perdomo-Gomez's name. *Id.* at 25:2-4. Armed with that information, Special Agent Moore discovered that HSI previously encountered Mr. Perdomo-Gomez in the context of an investigation in which HSI recovered 8 kilograms of heroin and U.S. currency in 2015. *Id.* at 25:2-10. During that 2015 investigation, records reflect that Mr. Perdomo-Gomez was interviewed in Spanish by Francisco Travino, an Immigrations and Customs Enforcement officer assigned to the HSI task force. *Id.* at 145:13-19, 146:8-147:3. In that interview, Officer Travino learned that Mr. Perdomo-Gomez was originally from the Dominican

Republic, but had been in the United States since 2010 and worked at a barber shop. *Id.* at 147:15-17, 151:13-25.

With this background in mind, I turn to the events of March 2, 2017. Special Agent Moore was again conducting surveillance and observed Mr. Perdomo-Gomez switch vehicles from the Infiniti to the Chevy Traverse, as he had done in December 2016. *Id.* at 25:11-26:22. Special Agent Moore radioed for other agents, including Special Agent Kampman and Task Force Officer ("TFO") Lindley, to assist him with surveillance. *Id.* at 74:3-5, 107:2-18. Mr. Perdomo-Gomez drove the Traverse to an auto shop called A-Team Auto and pulled inside for a few minutes. *Id.* at 26:23-27:22, 75:4-18. He then drove to an alley in the city in what Special Agent Moore identified as a "counter-surveillance manner"--i.e., "circling the blocks with no . . . purpose of direction, . . . trying to detect if there [wa]s law enforcement behind him." *Id.* at 28:1-13; *see also id.* at 75:25-76:12. Agents observed Mr. Perdomo-Gomez park the Traverse and walk down an alleyway, where he met with an unknown male for 1-2 minutes. *Id.* at 28:11-29:7, 75:19-77:21.[1] Mr. Perdomo-Gomez then entered another alley behind a barber shop on North Avenue. *Id.* at 30:6-10, 77:25-78:9. Special Agent Moore, who was then a block to a block and a half

---

[1] Mr. Perdomo-Gomez asserts that no agents who testified at the hearing observed this meeting, but that is belied by Special Agent Kampman's testimony. ECF No. 64 at 75:19-77:21.

4

away, radioed for the closest surveillance agents to "encounter" Mr. Perdomo-Gomez. *Id.* at 30:6-12, 77:25-78:9.

Special Agent Kampman and TFO Lindley were closest, and they approached Mr. Perdomo-Gomez in the alley as he was exiting his driver's-side door, identifying themselves as police. *Id.* at 78:12-79:2, 108:10-109:1. Both were in plain clothes, but Agent Kampman was wearing his police badge and TFO Lindley a bulletproof vest. *Id.* at 79:3-11, 108:21-109:1. They did not draw their weapons. *Id.* at 31:8-10, 79:12-15. TFO Lindley asked Mr. Perdomo-Gomez, in English, for identification, and Mr. Perdomo-Gomez handed his ID over. *Id.* at 80:4-12, 109:22-110:2. TFO Lindley then asked, again in English, whether there was anything illegal in the car and Mr. Perdomo-Gomez said no. *Id.* at 80:19-81:3, 110:9-16. TFO Lindley asked in English whether the agents could search the car, and Mr. Perdomo-Gomez responded, in English, yes. *Id.* at 81:6-12, 110:22-111:5. Finally, TFO Lindley asked in English for Mr. Perdomo-Gomez's keys, and he handed them over. *Id.* at 81:13-20. The conversation lasted under two minutes, and both agents observed that Mr. Perdomo-Gomez did not pause or appear confused by any questions. *See, e.g.*, *id.* at 83:3-8, 111:19-112:8.

Special Agent Moore arrived in the alley. Mr. Perdomo-Gomez was taken to Special Agent Moore's car and placed in the passenger seat, handcuffed for officer safety, such that Mr. Perdomo-Gomez

5


had a view of the other agents searching his car. *Id.* at 30:24-32:19. Special Agent Moore asked Mr. Perdomo-Gomez, in English, what he had been doing at the auto body shop, and Mr. Perdomo-Gomez responded, in English, that it had to do with his tire. *Id.* at 33:12-16. Special Agent Moore also asked, in English, who Mr. Perdomo-Gomez met with in the alley, and he responded, "nobody." *Id.* Special Agent Moore got the sense that Mr. Perdomo-Gomez could understand English because he replied to his questions without pause, but he testified that he felt Mr. Perdomo-Gomez was not being truthful. *Id.* at 33:5-34:1. Hoping Mr. Perdomo-Gomez would be more forthcoming in his native language, Special Agent Moore contacted Special Agent Tino Gonzalez, a Spanish speaker, by phone. *Id.* at 34:2-10. Special Agent Moore asked Special Agent Gonzalez to confirm with Mr. Perdomo-Gomez that he had indeed consented to a search of his vehicle. *Id.* at 132:21-133:2. Mr. Perdomo-Gomez consented again in Spanish. *Id.* at 133:3-8. Special Agent Gonzalez also read Mr. Perdomo-Gomez his *Miranda* rights, and Mr. Perdomo-Gomez waived those rights. *Id.* at 133:9-15.

After a few minutes of searching, TFO Lindley found a trap compartment in the Chevy Traverse. *Id.* at 34:23-35:10. Inside was approximately 800 grams of heroin. *Id.* at 36:21-37:2, 84:15-18, 113:8-114:14. Mr. Perdomo-Gomez has now moved to suppress discovery of that heroin.

II.

Mr. Perdomo-Gomez argues first that the government did not have reasonable suspicion to approach and detain Mr. Perdomo-Gomez's vehicle. "An investigatory stop complies with the Fourth Amendment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (citing, *inter alia*, *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). "The officers initiating the investigatory stop must be able to point to 'specific and articulable facts which, taken together with rational inferences from those facts,' suggest criminal activity." *Id.* (citing *Terry*, 392 U.S. at 21). Reasonable suspicion is an objective standard less demanding than probable cause, but mere "[i]narticulate hunches" will not suffice. *Id.*

Here, the government presented sufficient evidence of reasonable suspicion. Law enforcement knew that in the months leading up to March 2017, Mr. Perdomo-Gomez had twice used the Chevy Traverse to deliver narcotics proceeds to others, and further, given his comments to the confidential informant in November 2016, that the Traverse contained a secret "trap" compartment. On March 2, 2017, law enforcement observed Mr. Perdomo-Gomez retrieve the Chevy Traverse in the same manner as he had done when he engaged in prior criminal activity, make brief

7

stops in which he interacted or could have interacted with unknown individuals, and drive in a manner suggesting he was intending to avoid surveillance. Considering, as I must, "the sum of all the information known to officers at the time of the stop," *id.*, I conclude that law enforcement had reasonable suspicion of criminal conduct.

Mr. Perdomo-Gomez maintains that not all of the government's evidence supporting reasonable suspicion was established through competent testimony at the evidentiary hearing. He recognizes that under the collective action doctrine, an officer may be authorized to stop a suspect even if he does not have personal knowledge of all facts amounting to reasonable suspicion if the collective knowledge of the agency for which he works is sufficient. *See United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010). He argues, however, that the government failed to introduce key witnesses to substantiate HSI's evidence, which Special Agent Moore relied upon when he ordered the agents to "encounter" Mr. Perdomo-Gomez. For example, he points out that neither the confidential informant involved in the November 2016 delivery nor the Spanish-speaking agent who interviewed that confidential informant testified at the hearing; nor did the Chicago police officers who identified Mr. Perdomo-Gomez following the traffic stop of the Traverse in December 2016. ECF No. 66 at 11. But, for the sake of argument, even if I fully discounted the

parts of Special Agent Moore's testimony referencing the statements of the confidential informant and the police identification of Mr. Perdomo-Gomez, there is still enough in the record to establish reasonable suspicion. Special Agent Moore personally observed Mr. Perdomo-Gomez, whom he identified at the hearing, drive the Traverse and take a bag into a hotel in November 2016 that he later saw contained hundreds of thousands of dollars in cash. With or without Mr. Perdomo-Gomez's statement to the confidential informant regarding the Traverse's "trap" compartment, Special Agent Moore's personal observations--in November and December 2016 and on March 2, 2017--support a reasonable suspicion of criminal conduct.

Mr. Perdomo-Gomez also argues that the investigatory detention "quickly evolved into a full-blown custodial arrest once Mr. Perdomo-Gomez was handcuffed and placed in a law enforcement vehicle." ECF No. 66 at 8. "Police restraint may become so intrusive that, while not technically an 'arrest,' it becomes 'tantamount' to an arrest requiring probable cause." *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011). When determining whether a stop has evolved into an arrest requiring probable cause, "[t]he question is whether the officer's actions were reasonable under the circumstances and whether the surrounding circumstances gave rise to a justifiable fear for personal safety on the part of the officer." *Id.*

9

Special Agent Moore testified that Mr. Perdomo-Gomez was handcuffed for officer safety. ECF No. 64 at 32:3-7. Although Mr. Perdomo-Gomez did not appear hostile or aggressive to the agents, because the officers were conducting an automobile search for illegal drugs, it was reasonable to place Mr. Perdomo-Gomez in handcuffs while the agents conducted their search. *Bullock*, 632 F.3d at 1016. "Drug crimes are associated with dangerous and violent behavior and warrant a higher degree of precaution." *Id.*

Accordingly, I conclude that law enforcement had reasonable suspicion sufficient to justify the investigative stop of Mr. Perdomo-Gomez.

### III.

Mr. Perdomo-Gomez's final argument is that he did not knowingly consent to the search of the Chevy Traverse because he was not sufficiently proficient in English to understand TFO Lindley's request for consent. The Fourth Amendment's warrant requirement does not apply in circumstances where an authorized party voluntarily consents to a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government bears the burden to establish that consent is "freely and voluntarily given." *Id.* To determine whether consent is voluntary, courts consider the totality of the circumstances, including the defendant's "age, education, and intelligence; whether he was advised of his constitutional rights; how long he was detained prior to consent;

10

whether he consented immediately or after police made several requests; whether the police used physical coercion; and whether he was in custody." *Ruiz*, 785 F.3d at 1146.

Here, Mr. Perdomo-Gomez does not argue that he was coerced, and the undisputed testimony is that he consented in English to the search almost immediately after the stop was initiated and at the first request for consent. He does contend, however, that he simply did not understand the request because he only speaks Spanish.

At the hearing, Mr. Perdomo-Gomez introduced testimony from Jocelyn Reynoso, Mr. Perdomo-Gomez's partner and the mother of his daughter. ECF No. 64 at 155:20-156:3. Ms. Reynoso testified that since she met Mr. Perdomo-Gomez in 2015, they have communicated only in Spanish because he understands only Spanish. *Id.* at 156:16-157:9. She said that at times he worked as a driver for Uber in Chicago, but he did not need to speak English for that job in the normal course, and if he did need to communicate with any English-speaking passengers, he would use Google Translate or call her with questions. *Id.* at 158:2-20. Mr. Perdomo-Gomez also points out that HSI agents felt the need to interview him in Spanish in 2015, and Special Agent Moore decided to call Special Agent Gonzalez to translate while the search was in progress on March 2, 2017.

11

But the government has nevertheless met its burden to establish that Mr. Perdomo-Gomez consented to the search. Special Agent Moore, Special Agent Kampman, and TFO Lindley all testified that they had exchanges in English with Mr. Perdomo-Gomez on March 2, 2017, and he answered their questions promptly, appropriately, without apparent confusion, and in English. *Id.* at 33:7-23, 83:3-5, 111:25-112:8. I found the agents' testimony credible and consistent. Mr. Perdomo-Gomez has also lived in the United States since 2010 and worked at a barber shop and as an Uber driver, and it is likely that he has developed at least a passing familiarity with the English language through his presence in Chicago and his work. Although the HSI agents' use of Spanish-language interviewers suggests they believed Mr. Perdomo-Gomez would be more comfortable conversing in Spanish, it does not establish that Mr. Perdomo-Gomez was not proficient enough in English to consent to a search of his car. Indeed, he subsequently affirmed his consent in Spanish with Special Agent Gonzalez, which affirmation, although obviously insufficient to support initiation of the search because it was already in progress by then, is evidence that Mr. Perdomo-Gomez intended to consent to the search when he was asked in English in the first place.

Because I conclude that law enforcement had reasonable suspicion to initiate the investigatory stop and Mr. Perdomo-Gomez

consented to the search of his car, the motion to suppress [55] is denied.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: November 16, 2021